FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★ MAR 1 - 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

MICHAEL WARREN and EVELYN WARREN,

        Plaintiffs,

    -against-

THE CITY OF NEW YORK, a municipal entity; NEW
YORK CITY POLICE COMMISSIONER RAYMOND
KELLY; NEW YORK CITY POLICE SERGEANT
STEVEN TALVY (Shield No. 5408); NEW YORK CITY
POLICE OFFICER JOSEPH TILLOTSON (Shield No.
30215); NEW YORK CITY POLICE OFFICER JOHN
ACCONI (Shield No. 5075); NEW YORK CITY POLICE
OFFICER MIRABEL SARANTE (Shield No. 10211);
NEW YORK CITY POLICE OFFFICER ANTHONY
CAROZZA (Shield No. 16222), individually and in their
official capacities; and JOHN DOES 1-10, New York City
Police Officers, Supervisors and/or Commanders,
individually and in their official capacities,

        Defendants.
------------------------------------------------------------------- 

08-CV-3815 (ARR) (RER)

NOT FOR PRINT OR
ELECTRONIC
PUBLICATION

OPINION & ORDER

ROSS, United States District Judge:

    Plaintiffs, Michael and Evelyn Warren, bring this action pursuant to 42 U.S.C. § 1983

and New York State Law against defendant Sergeant Steven Talvy and other police officers of

the New York City Police Department ("NYPD")[1].  They seek to hold defendants liable for

violations of their constitutional rights in connection with their arrest in Brooklyn, New York, on

the afternoon of June 21, 2007.  Now before the court is defendants' motion for partial summary

judgment.  For the reasons set forth below, defendants' motion is denied.

---

[1] Plaintiffs' claims of municipal liability against the City of New York have been bifurcated and are not addressed in
this motion.

## I. BACKGROUND

Resolving all credibility issues and drawing all inferences in favor of plaintiffs, as required by the instant motion, a reasonable jury could reach the following factual conclusions drawn from the parties' statements pursuant to Local Civil Rule 56.1 and plaintiffs' deposition testimony.

On the afternoon of June 21, 2007, plaintiffs Michael and Evelyn Warren were driving their Range Rover north on Vanderbilt Avenue in Brooklyn, New York. The Warrens came to a stop at the traffic light at the intersection of Vanderbilt Avenue and Atlantic Avenue. While stopped, the Warrens observed a young black male running towards the intersection being pursued by what appeared to be a number of armed, plain-clothed police officers. Mr. Warren observed the police officers eventually overtake the young man, when one of the officers "flung forward and boom, slammed him down." The officers then rear-handcuffed the young male before one of the officers, later identified as Sergeant Talvy, kicked the suspect in the head, before backing off a few feet while keeping his hand on his pistol. The Warrens then watched as the other arresting officers repeatedly "punched and kicked" the subdued prisoner. At this point, Mr. Warren, a civil rights attorney, and his wife, who is also an attorney, exited the car out of concern for the young prisoner. Mr. Warren then protested, in sum and substance: "Officers, please stop this, you don't have to beat him like this, he doesn't have to be beaten like this. If he committed a crime, do what you should do, take him into the precinct and charge him." Sergeant Talvy then turned around and told Mr. Warren to "shut the fuck up" and get back into his car. Mr. and Mrs. Warren complied with Talvy's order and returned to their car; though Mr. Warren continued to object as he retreated, at some point saying, in substance, "you can't fucking do

that." Once in the car, Mr. and Mrs. Warren began taking down information including license plate and badge numbers.

Sergeant Talvy then approached the vehicle and said: "What the fuck do you think you're doing?" The Warrens replied that that they were attorneys, and that they had a "constitutional right to do this, this is wrong." Sergeant Talvy warned Mr. Warren that he had already told him to stay out of the officers' business. Talvy then demanded that Mr. Warren open the car door but at the same time struck Mr. Warren on the left side of his face through the open driver-side window with five close-fisted punches, which Mr. Warren described as "wild, thrustful swings, hard swings." During the altercation Sergeant Talvy also punched Mrs. Warren once in the jaw with a closed fist. Talvy then opened the unlocked car door and dragged Mr. Warren out, in the process ripping off most of the buttons of his shirt, and almost the entire length of his pants leg, threw him up against the Range Rover, punched him in the head, rear-cuffed him and escorted him to the police van, where he pushed Mr. Warren inside, finally injuring Mr. Warren's arm in the process.[2] At some point during the altercation, Talvy stated, "if you had stayed out of our fucking business [,] . . . this wouldn't have happened."

Her husband having been removed from the car and arrested, Mrs. Warren then asked Sergeant Talvy if she could now take their car. Talvy asked for her license and told her that none of this would have happened if they just minded their business. Mrs. Warren responded, "but you shouldn't have been doing that" to which Talvy replied: "Well, it's your word against my word, let's see what happens." Talvy then gave Mrs. Warren's driver's license to a female officer who began recording her personal information. Mrs. Warren then approached the female officer and asked for her license back, reaching her hand out as she spoke. The female officer

---

[2] The record before the court does not include any evidence of any persistent injuries, or injuries requiring medical attention, sustained by either of the Warrens.

moved her hand away. The female officer then allegedly reported falsely to Talvy that Warren "tried to take her license, and she scratched me." Talvy then ordered the female officer to "take her down" or "put her down." While onlookers proclaimed "don't do that to her," several officers grabbed her, pushed her against the car and rear handcuffed her. Approximately ten or fifteen minutes after Mr. Warren had been placed in the police van, he observed Mrs. Warren, now restrained in handcuffs, being brought to the same police van. Both were then brought to the 77th Precinct where they were lined up with other arrestees, and one of the officers, upon seeing the state of Mr. Warren's attire, quipped: "[W]ell we got a regular striptease show here." The Warrens were then placed in separate cells.

Mr. Warren was charged with Obstruction of Governmental Administration, Resisting Arrest, and Disorderly Conduct. In support of these charges, Talvy reported that Warren had placed himself between the sergeant and the officers, refused to get out of the way, yelled "I'm a fucking lawyer and you motherfuckers can't do this," walked back to his vehicle and refused to get out after he was told he was going to be placed under arrest. Warren was released sometime between 11:00 p.m. and midnight and was given a Desk Appearance Ticket.[3] Mrs. Warren was given a summons for Disorderly Conduct. The summons stated that Ms. Warren had "snatched" her ID out the female officer's hand causing a minor injury. Mrs. Warren was released between 10:00 p.m. and 11:00 p.m. On August 16, 2007 and September 12, 2007, respectively, Mr. Warren and Mrs. Warren were arraigned and released on their own recognizance without posting bail. From August 2007 to July 2008, Mr. Warren appeared for seven court appearances and

---

[3] The Desk Appearance Ticket reads: "Should you fail to appear for the offense charged above, in addition to a warrant being issued for your arrest, you may be charged with an additional violation of the Penal Law which upon conviction may subject you to a fine, imprisonment, or both. Additionally, if you fail to comply with the directions of this Desk Appearance Ticket, any bail paid will be subject of forfeiture." Larkin Decl., Ex. L.

Mrs. Warren appeared for six court appearances,[4] all regarding a series of discovery and scheduling issues.  On July 2, 2008, the District Attorney dismissed all criminal charges on the grounds of insufficient evidence.

## II. DISCUSSION

Plaintiffs' complaint asserts several claims under 42 U.S.C. § 1983 and New York state law against Sergeant Talvy and the other arresting officers and supervisors.  Defendants have moved for partial summary judgment only against plaintiffs' claims for malicious prosecution, abuse of process, intentional infliction of emotional distress, and claims against Police Commissioner Raymond Kelly to the extent they seek recovery for his personal involvement in the alleged violations.  Defendants argue: (1) that plaintiffs' multiple court appearances do not establish a post-arraignment deprivation of liberty sufficient to constitute a "seizure" under the Fourth Amendment and support a malicious prosecution claim under § 1983; (2) plaintiffs cannot maintain a claim for abuse of process because the evidence fails to establish that the arresting officers had a "collateral purpose" in effectuating process; (3) the force applied by defendants during the arrest fails as a matter of law to establish "extreme and outrageous" behavior sufficient to support a claim of intentional infliction of emotional distress (IIED); and (4) that to the extent that plaintiffs' claims against Commissioner Kelly allege his personal involvement in constitutional violations, they should be dismissed.

### A.      Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

---

[4] Mrs. Warren did not appear on March 3, 2008 due to illness.

249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks and ellipses omitted)).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003) (internal quotation marks omitted)); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment against it, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (citing Anderson, 477 U.S. at 255).

**B.    Malicious Prosecution**

*1. Fourth Amendment "Seizure"*

Plaintiff asserts a claim for malicious prosecution under § 1983 and New York state law grounds. "In order to prevail against a state actor for malicious prosecution, a plaintiff must

6

show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010). A malicious prosecution claim has four elements under New York law: (1) the initiation of a proceeding against the plaintiff; (2) termination of the proceeding in his favor; (3) lack of probable cause; and (4) malice. Id. at 161. To establish a claim of malicious prosecution amounting to a constitutional tort, however, a § 1983 plaintiff must also establish a fifth element: "plaintiff must show that he suffered a deprivation of liberty resulting from the initiation or pendency of judicial proceedings" such that plaintiff was "seized" within the meaning of the Fourth Amendment. Johnston v. Port Auth. of New York & New Jersey, 09-CV-4432 (JG) (CLP), 2011 U.S. Dist. LEXIS 82815 (E.D.N.Y. July 18, 2011) (quoting Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997)); Singer v. Fulton County Sherriff, 63 F.3d 110, 116 (2d Cir. 1995) (the plaintiff "must show some post-arraignment deprivation of liberty that rises to the level of a constitutional violation"). The parties dispute only whether plaintiff can establish this last element. Defendants argue that the Second Circuit's recent opinion in Burg v. Gosselin, 591 F.3d 95 (2d Cir. 2010), compels the conclusion that plaintiffs were not sufficiently deprived of their liberty following their arraignment so as to constitute a "seizure." Plaintiffs respond that the Desk Appearance Ticket and summons issued to Mr. and Mrs. Warren, the number of times they were required to appear in court in connection with their prosecution, and the effect of New York Criminal Procedure Law (NYCPL) § 510.40 that compelled them to "render[] [themselves] at all times amenable to the orders and processes of the court" following their release on bond, combined to establish a deprivation of liberty rising to a seizure under the Fourth Amendment. The court agrees with plaintiffs.

In the Second Circuit's most recent discussion of this issue, the court evaluated whether a pre-arraignment summons issued to a plaintiff based on an infraction committed by the plaintiff's dog that required her to appear at court in one instance constituted a Fourth Amendment "seizure." Burg, 691 F.3d at 96. The court held that the requirement of a single court appearance "without further restrictions, does not constitute a Fourth Amendment seizure." Id. at 98. The court explicitly distinguished the case from Murphy v. Lynn, which found a Fourth Amendment seizure for the purposes of a malicious prosecution claim where the post-arraignment plaintiff was expressly prohibited by the court from leaving the state of New York as a condition of his release. 118 F.3d 938, 946 (2d Cir. 1997). The court, while noting that the plaintiff in Murphy had also been required to attend eight court appearances in connection with the case and that "the number of appearances may bear upon whether there was a seizure," also questioned "how multiple appearances required by a court or for the convenience of the person answering the summons, can be attributed to the conduct of the officer who issues it." Burg, 591 F.3d at 98.

This case falls squarely between Burg and Murphy. Here, like Murphy, plaintiffs' alleged seizure took place post-arraignment after formal submission to the jurisdiction of the criminal court. Similarly, too, the Warrens were required to appear in court on six or seven occasions, far more than the single required court appearance in Burg. Unlike Murphy, however, these court appearances, relating primarily to pretrial discovery, scheduling matters, and ultimately the case's dismissal, were not accompanied by other burdensome conditions, such as the travel restrictions at issue in Murphy. See Parkash v. Town of Southeast, 10 CV 8098 (VB), 2011 U.S. Dist. LEXIS 128545 (Sep. 30, 2011) (finding that plaintiffs fifteen required court appearances without additional travel restrictions did not constitute a seizure and noting Burg's

extensive discussion of the "importance of travel restrictions to the finding of a seizure in a claim for malicious prosecution").

As plaintiffs argue, however, it is the Second Circuit's opinion in Rohman v. New York City Transit Authority, presenting relevant facts indistinguishable from those presented in this record, that controls the outcome here.  215 F.3d 209 (2d Cir. 2000).  In Rohman, the Circuit addressed whether a § 1983 malicious prosecution plaintiff had been seized for the purposes of the Fourth Amendment, concluding that the limitations on Rohman's post-arraignment release "sufficiently demonstrated the requisite post-arraignment restraint of liberty . . . [and] at least at the pleading stage, [] implicate the Fourth Amendment." Id. at 216.  In support of this conclusion, the court noted that plaintiff was required as a condition of his bail on his own recognizance to return to court on at least five occasions; and additionally, that a criminal defendant released on his own recognizance must "'render himself at all times amenable to the orders and processes of the court' . . . and therefore must ordinarily remain in the state." Id. (quoting N.Y.C.P.L. § 510.40); see also Douglas v. City of New York, 595 F. Supp. 2d 333, 348 (S.D.N.Y. 2009) (finding upon reconsideration that plaintiffs' five or six court appearances and similar bail restrictions constituted a "seizure" in light of Rohman).  The court found, then, that the operative effect of § 510.40—whereby a post-arraignment criminal defendant must at all times be subject to the criminal court's demands—imposed limitations that sufficiently restricted plaintiff's liberty so as to constitute a Fourth Amendment seizure. Likewise here, plaintiffs were released on their own recognizance, were subject to § 510.40, and were required to return to court on more than five occasions.  Rohman is therefore directly on point.

Defendants urge this court to reject Rohman as directly controlling the outcome here and dismiss its holding as mere dicta and/or abrogated in light of the principles announced in the

Second Circuit's recent opinion in Burg. Defendants observe that, notwithstanding Rohman's conclusion that the plaintiff had been seized within the meaning of the Fourth Amendment, the court granted summary judgment in favor of defendants on the grounds that the law regarding the first element of a malicious prosecution claim—whether or not defendants "initiated" the proceeding—was not clearly established and that those defendants were therefore entitled to qualified immunity. Id. at 218. On this basis, defendants contend that the Rohman court's constitutional pronouncements regarding the scope of a Fourth Amendment seizure were not necessary to the court's holding, and thus constituted mere dicta.

This court is not persuaded. In cases brought under § 1983 and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court has expressly permitted (and for a period of time required) lower courts making qualified immunity determinations to determine first whether a constitutional right exists before examining whether the right was clearly established. See Pearson v. Calahan, 555 U.S. 223, 237 (2009). While in tension with "usual adjudicatory rules suggest[ing] that a court should forbear resolving [constitutional] issues" where not necessary to resolve the case before it, this discretion to "avoid avoidance" in the context of qualified immunity adjudication permits courts to prevent "frustrat[ing] 'the development of constitutional precedent' and the promotion of law-abiding behavior." Camreta v. Greene, __ U.S. __, 131 S.Ct. 2020, 2031-32 (2011) (quoting Pearson, 555 U.S. at 237). More importantly for purposes of understanding the parameters of the Rohman holding, however, the Supreme Court in Camreta made clear that Court of Appeals holdings specifying the contours of a constitutional right, even where defendants prevail on qualified immunity grounds, are precedential and controlling on this court. As the Court wrote, in cases brought under § 1983 and Bivens, where courts make "constitutional determinations" yet rule for defendants on

qualified immunity grounds, such determinations should not be treated as "mere dicta or 'statements in opinions.'" <u>Camreta v. Greene</u>, __ U.S. ___, 131 S.Ct. 2020, 2030 (2011) (quoting <u>California v. Rooney</u>, 483 U.S. 307, 311 (1987) (per curiam)).  Rather, "[t]hey are rulings that have a significant future effect on the conduct of public officials . . . and the policies of the government units to which they belong. . . . And more: they are rulings self-consciously designed to produce this effect, by establishing controlling law and preventing invocations of immunity in later cases. And still more: they are rulings designed this way with this Court's permission, to promote clarity—and observance—of constitutional rules." <u>Id.</u>  The Court thus concluded: "No mere dictum, a constitutional ruling preparatory to a grant of immunity creates law that governs the official's behavior." <u>Id.</u> at 2033.  This court therefore declines to disregard the constitutional holding in <u>Rohman</u>, despite the case's resolution on qualified immunity grounds, as mere dicta. [5]

Nor has the holding in <u>Rohman</u> been abrogated or overruled.  Though defendants point to <u>Burg</u>'s favorable citations to decisions from other circuits holding that restrictions greater than those imposed in <u>Rohman</u> do not constitute a Fourth Amendment seizure,[6] the <u>Burg</u> court's

---

[5] In a footnote, the <u>Burg</u> court noted that <u>Rohman</u>'s constitutional holding was "arguably dicta because the Court ultimately determined that the defendant was entitled to summary judgment on qualified immunity grounds." <u>Burg</u>, 591 F.3d at 98 n.4. But the Supreme Court's more recent discussion in <u>Camreta</u> of the status of constitutional holdings in two-step qualified immunity cases forecloses such summary dismissal. More importantly, the <u>Burg</u> court addressed and narrowly ruled on whether a pre-arraignment summons requiring one court appearance constituted a Fourth Amendment seizure. The <u>Burg</u> court had no occasion to, and thus did not address the more onerous conditions—a post-arraignment release subject to a criminal securing order and five court appearances—at issue in <u>Rohman</u>. The <u>Burg</u> court's footnote referring to <u>Rohman's</u> holding as "arguably dicta" was thus itself dicta.

[6] <u>See</u> <u>Karam v. City of Burbank</u>, 352 F.3d 1188, 1191-94 (9th Cir. 2003) (plaintiff subject to "Own-Recognizance Release Agreement" which required her "to obtain permission from the court before leaving the state," and "to appear in court [at a specific date] and at all other times and places ordered by the court" was not seized under the Fourth Amendment as conditions were "no more burdensome than the promise a motorist makes when issued a traffic citation"); <u>Kingsland v. City of Miami</u>, 382 F.3d 1220,1236 (11th Cir. 2004) (no seizure following pre-trial release where plaintiff handcuffed, charged with DUI, and posted a $1,000 bond for release and had to travel from New Jersey to Florida on two separate occasions to appear in court); <u>see also</u> <u>Bielanski v. County of Kane</u>, 550 F.3d 632, 642 (7th Cir. 2008) (issuance of summons that included order not to leave state without court's permission fails to constitute a seizure).

holding was itself exceedingly narrow:  A pre-arraignment summons requiring a single court appearance "without further restrictions, does not constitute a Fourth Amendment seizure." Burg, 691 F.3d at 96.  Given the scope of its holding, the Burg court's mere expression of approval of the decisions of other circuits does not impliedly overrule Rohman.  Rohman stands for the proposition that a post-arraignment plaintiff subject to the "own recognizance" restrictions of NYCPL § 510.40 and required to appear for five court appearances is effectively "seized" under the Fourth Amendment.  Plaintiffs here were released on their own recognizance post-arraignment, subject to the provisions of § 510.40, and were required to appear in court on more than five occasions.  Accordingly, Rohman mandates the conclusion that plaintiffs were "seized" for the purposes of the Fourth Amendment.

### 2. *Personal Involvement*

Defendants also argue that as police officers, they could not have been "personally involved" in the malicious prosecution, because the prosecution, which by definition takes place after arraignment and pursuant to judicial proceedings, cannot be attributable to them.  The argument fails.  A police officer may be held liable for malicious prosecution when the police officer provides false information to a prosecutor. See Cameron v. City of New York, 598 F.3d 50, 63,65 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior . . . .  The prosecutor's actions do not supersede the complaining officer's actions; they only determine whether the officer's actions came to fruition—that is, whether the officer committed the tort of malicious prosecution or merely attempted to prosecute maliciously.") (emphasis in original); Yan v. City of New York, 09-CV-1435 (CBA)(SMG), 2011 U.S. Dist. LEXIS 137549, at *29

(E.D.N.Y. Nov. 30, 2011) ("'In malicious prosecution cases brought against police officers,

plaintiffs have demonstrated that officers initiated criminal proceedings by having the plaintiff

arraigned, by filling out complaining and corroborating affidavits, and by signing felony

complaints.'") (quoting Mitchell v. Victoria Home, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006)).

Construing the facts in the light most favorable to plaintiffs, Sergeant Talvy and other officers at

the scene falsely reported their accounts in their reports, causing plaintiffs to be arraigned.  The

court therefore denies summary judgment as to plaintiffs' malicious prosecution claims.

### C.    Abuse of Process

"In New York, a malicious abuse-of-process claim lies against a defendant who

(1) employs regularly issued legal process to compel performance or forbearance of some act

(2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral

objective that is outside the legitimate ends of the process." Savino v. City of New York, 331

F.3d 63, 76 (2d Cir. 2003) (quoting Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir.1994)) (internal

quotation marks omitted) (alteration in original).  Malicious abuse of criminal process also

supports § 1983 liability.  Id.  "[L]egal process means that a court issued the process, and the

plaintiff will be penalized if he violates it[.]"  Cook, 41 F.3d at 80 (citing Mormon v. Baran, 35

N.Y.S.2d 906, 909 (Sup. Ct. 1942)).  Defendants contest only the third element of plaintiffs'

abuse of process claim, arguing that the evidence in the record does not support the inference

that any of the defendants had a "collateral objective that is outside the legitimate ends of

process."  The court disagrees.

"The crux of a malicious abuse of process claim is the collateral objective element.  To

meet this element, a plaintiff must prove not that defendant acted with an improper motive, but

rather an improper purpose—that is, 'he must claim that [the defendant] aimed to achieve a

13

collateral purpose beyond or in addition to his criminal prosecution.'" Douglas v. City of New York, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009) (quoting Savino, 331 F.3d at 76).[7] The New York Court of Appeals has identified typical collateral objectives associated with abuse of process claims, stating that a claim lies "[w]here process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail, or retribution." Board of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y. 2d 397, 404 (1975); Cabble v. City of New York, No. 04 CV 9413 (LTS), 2009 WL 890098, at *4 (S.D.N.Y. Mar. 30, 2009) ("[T]he New York Court of Appeals has cited the infliction of economic harm, extortion, blackmail, and retribution as examples of the types of collateral objectives at which the abuse of process tort is aimed.").

The Warrens contend that their arrest and the issuance of the desk appearance ticket and summons were motivated by a "collateral objective outside the legitimate ends of the legal process"—namely, to retaliate against them for exercising their right to free speech. Plaintiffs rely primarily on Cook v. Sheldon, 41 F.3d 73 (2d Cir. 1994), in which the Second Circuit recognized the constitutional tort of abuse of process and set forth the elements grounded in state law. A brief discussion of the facts of Cook is illuminating.

In Cook, following a traffic stop during which the defendant trooper concluded that the car did not have valid license plates or a Vehicle Identification Number ("VIN"), the three occupants of the car, including Cook, a passenger, were brought to a police station. Id. at 75-76. When the driver of the car, a non-English speaker, was brought into the interrogation room, Cook called out to his friend in Spanish: "You are being arrested. You have a right to a lawyer.

---

[7] The New York Court of Appeals explained this critical distinction in Hauser v. Bartow: "If [an actor] uses the process of the court for its proper purpose, though there is malice in his heart, there is no abuse of the process. . . . As soon as the actor uses the process of the court, not to effect its proper function, but to accomplish through it some collateral object, he commits this tort." 273 N.Y. 370, 374 (1937) (emphasis in original).

You have a right to remain silent and I think that you should ask for a lawyer now." Id. at 76. A trooper then confronted Cook and asked him, "Do you want to lawyer up? We will arrest all of you." Id. After explaining to the trooper that he was advising his friend of his rights because his friend was unfamiliar with American law, the trooper told him that "everyone would be arraigned because of Cook's conduct." Id. After concluding that the troopers had no probable cause to believe that Cook, himself, had committed any crime, the court denied summary judgment against Cook's abuse of process claim, reasoning that jury could find that the troopers effectuated criminal process for a collateral objective because the "[t]roopers did this to harm Cook, as retribution for advising [his friend]." Id. at 80. The facts in this case closely resemble Cook.

Here, as in Cook, plaintiffs allege that Talvy, the arresting officer, explicitly acknowledged that he was arresting the Warrens because they spoke out against the officers' abusive conduct toward a fleeing suspect. Talvy told plaintiffs, separately, that if they had stayed out of the officers' "business [,] . . . none of this would have happened." These bald statements by defendant Talvy, combined with plaintiffs' account that they had only verbalized their opinion that abusing the young suspect was wrong but had in no way interfered with any police action, could lead a rational juror to conclude that the purpose of arresting and charging plaintiffs was to harm them as retribution for speaking out against the officers' conduct.[8] In Cook, the evidence was sufficient to support an inference that in advising his friend of his constitutional rights, Cook was exercising his own right to free speech, and was arrested in retaliation for that activity. Likewise here, drawing all inferences in favor of plaintiffs, a

---

[8] Of course, under defendants' view of the facts, a juror might also rationally conclude that Sergeant Talvy arrested plaintiffs because of his belief—mistaken or not—that plaintiffs had violated the law. Such an objective would obviously not be collateral, even if motivated by defendants' animus towards plaintiff.

reasonable juror could conclude that plaintiffs were protesting the abusive behavior of the officers at the scene, and were arrested in retaliation for their lawful speech.

Defendants' attempt to distinguish <u>Cook</u> is unavailing. Defendants argue that in <u>Cook</u>, unlike here, the police officers charged the plaintiff with operating a stolen vehicle and driving without a registered VIN number, conduct unrelated to the facts underlying the alleged collateral purpose for which Cook was arrested—i.e. helping his friend understand the rights available to him. Here, defendants contend, plaintiffs were charged with Obstruction of Governmental Administration, Resisting Arrest, and Disorderly Conduct, charges the bases of which also form the purpose behind plaintiffs' arrest—i.e. plaintiffs protesting and obstructing Talvy and the officers' from apprehending and securing a criminal suspect. Because, in defendants' view, the retaliatory purpose that plaintiffs allege motivated their arrests arises from the same facts that defendants allege justified the arrests, the purpose of the criminal process cannot be "collateral." Defendants miss the mark.

Essentially, defendants propose that the court engraft an additional element onto an abuse of process claim: a requirement that the facts underlying the illegitimate "purpose" be wholly independent of the facts alleged to underlie the crimes charged. Defendants fail to cite, and the court cannot find, any authority for this proposition. To the contrary, the law is settled that the collateral objective element of an abuse of process claim is met when the purpose of effectuating process is collateral in the sense that it is a wrongful purpose "beyond or in addition to [defendant's] prosecution." <u>Savino</u>, 331 F.3d at 77; see <u>Parkash</u>, 2011 U.S. Dist. LEXIS 128545, at *20 ("[A]buse of process misuses or misapplies process justified in itself for an end other than that which it was designed to accomplish."). What matters is whether the criminal charges lodged against plaintiffs were brought for the purpose of criminal prosecution, or for some

16

ulterior purpose, such as retribution or extortion. The arguable factual basis of the crime charged against plaintiffs is immaterial. [9]

In Cook, the court found important that under plaintiffs' view of the facts, the police officers lacked any plausible reason to arrest and charge plaintiff other than the troopers' statement that Cook was being arrested for exercising his constitutional rights.  Accordingly, a reasonable jury could conclude that the purpose Cook was arrested was not criminal prosecution and conviction, but for retribution.  So too here.  Under the Warrens' view of the facts, Talvy and the arresting officers lacked any plausible reason to arrest and charge plaintiff other than Talvy's two statements that they were being arrested for getting involved in the officers' "business."  A reasonable jury could conclude that the Warrens were arrested not for criminal prosecution or conviction, but for retribution. [10]

Defendants argue that, for crimes such as obstruction of government administration and resisting arrest, the court's approach would "collapse the 'collateral objective' requirement onto the requirement that all arrests be supported by probable cause."  This argument is a red herring.  To the contrary, the "collateral objective" element can only be established in the rare circumstances in which independent evidence exists in the record that defendants actually had an

---

[9] Defendants' contrary approach would yield an absurd result.  Under defendants' theory, had the plaintiff in Cook been charged with obstruction of government administration for interfering with the interrogation of a criminal suspect, the Cook court would have rejected any abuse of process claim for lack of a collateral objective, notwithstanding the defendant trooper's explicit admission that he was arresting Cook for the purpose of retaliation. Such a result, which ignores evidence of the clearly collateral objective of an arrest based merely on the identity of the crime that the arresting officer elects to charge, is illogical. Moreover, even accepting defendants' theory, at this juncture, material issues of fact preclude defendants' assumption that the conduct underlying the crimes charged against the Warrens was identical to the conduct giving rise to the collateral purpose of the arrests.

[10] Defendants also argue that there is no evidence in the record that plaintiffs were arrested to "achieve retribution" because they had never met each other before the incident. A retaliatory collateral objective, however, can manifest itself in a very brief timeframe.  In Cook, for instance, the trooper had never met the plaintiff, but expressed his retaliatory purpose immediately after Cook tried to advise his friend. Here, Talvy's retaliatory objective could have arisen as soon as Mr. Warren expressed his concern for the young man being arrested.

improper purpose when effectuating process.[11]  As in <u>Cook</u>, such evidence exists in Talvy's

explicit admissions that the Warrens were arrested because of their speech; and from this, a

reasonable juror could infer an improper purpose of retaliation.  Because this court finds that

<u>Cook</u> cannot be coherently distinguished from the facts in this record, summary judgment must

be denied as to this claim.

      The record also supports an alternative theory establishing an abuse of process claim: that

defendants arrested plaintiffs to impugn their credibility with respect to the events of June 21,

2007, in the hopes of protecting their employment.  <u>Douglas,</u> 595 F.Supp. 2d at 344 (S.D.N.Y.

2009) ("Fabricating assault charges to save one's job could be abuse of process, however,

because 'safeguarding one's own employment lies outside the legitimate goal of criminal

process.'") (quoting <u>Hernandez v. Wells</u>, 01 Civ. 4376 (MBM), 2003 U.S. Dist. LEXIS 21146, at

*9 (S.D.N.Y. Nov. 18, 2003)).  In response to Mrs. Warren's protestation that the officers should

not have been beating the young man, Sergeant Talvy responded in substance: "Well, it's your

word against my word, let's see what happens."  From this, a reasonable juror could conclude

that the officers arrested and charged plaintiffs in order to impugn their credibility with respect to

their account of the events that day.

      Because plaintiffs have put forth evidence from which a rational juror could conclude

that the purpose of the effectuation of process against them was not to subject them to criminal

prosecution, but rather either (1) to retaliate against them for voicing their opinions or (2) to

---

[11] While showing a lack of probable cause does not displace the "collateral objective" element, the absence of probable cause may at least be circumstantial evidence that the purpose of arresting plaintiffs was not criminal prosecution—as a successful prosecution would be unlikely where the arrest lacked justification—but some ulterior purpose.  <u>Cf.</u> <u>Coleman v. City of New York</u>, 49 Fed. Appx. 342 (2d Cir. 2002) (unpublished opinion) (distinguishing <u>Cook</u> in part because there was no evidence that arrest was not supported by probable cause).

impugn their credibility as witnesses to protect the officers' jobs, summary judgment is denied as to plaintiffs' claims for abuse of process.

### D.       Intentional Infliction of Emotional Distress

Defendants argue (1) that plaintiff cannot establish intentional conduct by any defendant sufficiently outrageous to give rise to a cause of action for intentional infliction of emotional distress; and (2) that the conduct of which plaintiffs complain falls "well within the ambit of traditional tort liability."

To prevail on their state-law claim for intentional infliction of emotional distress (IIED), plaintiff must prove "four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996); Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993). "The first element—outrageous conduct— serves the dual function of filtering out petty and trivial complaints that do not belong in court, and assuring that plaintiff's claim of severe emotional distress is genuine." Howell, 81 N.Y.2d at 121 (citations omitted).  This element is also "the one most susceptible to determination as a matter of law." Id.  In order to maintain this cause of action, the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy v. Am. Home Products Corp., 58 N.Y.2d 293, 303 (1983) (internal quotation marks omitted).  Such conduct must also exceed the elements of other tort claims. Kavazanjian v. Rice, No. 03-CV-1923, 2008 WL 5340988, at *8 (E.D.N.Y. Dec. 22, 2008).  Where allegations "wholly overlap or are merely duplicative of other tort claims," New York courts have dismissed claims for IIED. Strassner v. O'Flynn, No. 04-CV-6021 (CJS), 2006 U.S. Dist. LEXIS 14313, at

*32 (W.D.N.Y. Mar. 27 2006) (citing Demas v. Levitsky, 291 A.D.2d 653, 660 (3d Dep't

2002)). Conceptually, this rule delineates what conduct may be considered sufficiently

outrageous to satisfy the first element of this cause of action. Id. ("New York courts have

permitted IIED claims to go forward where there were allegations of extreme and outrageous

conduct that exceeded the elements of other torts.").

In cases, such as here, where plaintiffs bring a claim of IIED in connection with

allegations of police misconduct, courts look to see whether plaintiffs' allegations are

sufficiently outrageous to exceed the elements of the traditional torts of false arrest, excessive

force, and assault and battery. This court cannot find as a matter of law that the police

misconduct plaintiffs have alleged—arresting them for speaking out against the extreme abuse of

a subdued prisoner, punching them repeatedly in the face with a closed fist, ripping Mr. Warren's

clothes and mocking him at the precinct, and pursuing baseless charges against them—does not

constitute extreme and outrageous conduct "utterly intolerable in a civilized community."

Murphy, 58 N.Y.2d at 303. Such conduct is not one of the "fairly typical examples of excessive

force . . . [that] do not rise to the level of 'outrageous' such as to support an IIED claim." See

Kirk v. Metropolitan Transp. Authority, No. 99 Civ. 3787 RWS, 2001 WL 258605 at *8

(S.D.N.Y. Mar. 14, 2001) (granting summary judgment for defendants on IIED claim where

plaintiff alleged that officer treated him roughly, unduly tightened his handcuffs, falsely accused

him of a crime, and threatened him with prosecution); see also Brewton v. City of New York,

550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008) (finding mere false arrest not "extreme and

outrageous"). Where, as here, the alleged police misconduct goes beyond the elements of the

other traditional torts, courts have permitted an IIED claim to go forward. See Wahhab v. City

of New York, 386 F.Supp.2d 277, 293 (S.D.N.Y. 2005) (denying summary judgment on IIED

claim where officers' alleged conduct included multiple unprovoked punches and kicks requiring hospitalization); Strassner, 2006 U.S. Dist. LEXIS 13131, at *35 (denying summary judgment where allegations included that police officers slammed plaintiff's head against a table, threw him against a wall, handcuffed and pepper-sprayed him, and punched and kicked him repeatedly during the arrest and at the precinct); Mejia v. City of New York, 119 F.Supp.2d 2332, 284-87 (E.D.N.Y. 2000) (permitting IIED claim where police subjected pregnant suspect to ethnic slurs, threatened her unborn baby, and had her strip-searched). Here, under plaintiffs' view of the facts, Sergeant Talvy punched Mr. Warren at least five times with a closed fist and struck Mrs. Warren once; Talvy then ripped Mr. Warren out of the car and arrested him, tearing off a considerable part of his clothes, which several officers mocked him about at the precinct. Finally, under plaintiffs' view of the facts, the defendant officers falsified their accounts of the incident and pursued false charges against the Warrens. While some of this conduct surely falls within the ambit of false arrest, malicious prosecution and excessive force, plaintiffs allege conduct beyond mere "garden variety" excessive force or false arrest claims. Rather, "a reasonable jury . . . could return a verdict including a component of damages for emotional distress that is over and above those awarded for other alleged torts." Wahhab, 386 F. Supp. 2d at 293; see Bender, 78 F.3d at 793 ("[T]he tort of inflicting emotional distress in the context of a false arrest or a malicious prosecution possibly involves some component of damages over and above the damages that may be awarded for these police misconduct torts.").[12]

Accordingly, summary judgment is also denied as to plaintiffs' claim for IIED.

**E.     Claims Against Commissioner Kelly**

---

[12] Further, any risk of duplicative award of damages can be managed by a proper jury instruction. See Bender, 78 F.3d at 794 (suggesting jury instruction that "[a]ny damage award for the emotional distress claim must be limited to the component of injury you find sustained for this claim, if any, over and above whatever emotional distress you have already compensated by your awards for other claims").

As both parties have acknowledged, any claims against Commissioner Kelly must be analyzed under a theory of municipal liability under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).  This basis for recovery has been severed from the instant action and shall be fully addressed in a separate proceeding. The court therefore reserves decision on whether plaintiffs' claims against Commissioner Kelly may proceed to trial.

### III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment with respect to plaintiffs' claims of malicious prosecution, abuse of process, and intentional infliction of emotional distress is denied.  The court reserves decision on plaintiffs' claims against Commissioner Kelly.

SO ORDERED.

/s/(ARR)

Allyne R. Ross
United States District Judge

Dated:       February 27, 2012
             Brooklyn, New York